# DECLARATION

I, Kevin Cornell, a Task Force Officer with the Drug Enforcement Administration (DEA), hereby state, pursuant to 28 U.S.C. § 1746, and under penalty and pursuant to the laws of the United States, that the following information is true and correct to the best of my knowledge, information, and belief:

1. I am a federal law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Title 21, United States Code.

2. In 1995, I obtained a Bachelor of Science Degree from the State University of New York (Brockport) with majors in Criminal Justice and Sociology as well as an minor in Military Science. I completed Basic Law Enforcement Training in November of 1997. I have been a sworn law enforcement officer for 25 years and am currently employed as a Deputy Sheriff by the Guilford County Sheriff's Office (GCSO). I was assigned to Field Operations Division – District II from August 1998 – October 2002. In October 2002, I transferred to the Special Operations Division – Crime Repression Team. In April of 2004, I was promoted to the rank of Corporal as a Detective and Canine Handler in the Special Operations Division -Vice & Narcotics Unit. In May of 2005, I was assigned to DEA – Narcotics Interdiction Task Force in Greensboro, North Carolina, where I assisted in investigating various narcotics cases and conducted drug interdiction activities as a federally sworn DEA Task Force Officer. I was promoted to the rank of Detective Sergeant in May of 2012, and I currently supervise the daily activities of the GCSO - Special



**EXHIBIT A**

Enforcement Team/Criminal Interdiction Unit and coordinate interdiction efforts related to the Triad High Intensity Drug Trafficking Areas Parcel Interdiction Program and Domestic Highway Enforcement Initiatives for the DEA. I have received over 720 hours of formal instruction and training specifically related to narcotics enforcement, narcotics-related investigations, and criminal/drug interdiction. I have attended over 168 hours of formal instruction and training specifically related to criminal interdiction involving commercial motor vehicles. I successfully completed "Operation Pipeline and Convoy" which is a required certification by the U.S. Department of Justice for any employee who conducts passenger vehicle and commercial motor vehicle highway interdiction. I have been involved in the seizure of U.S. currency, narcotics, firearms, and stolen property from commercial motor vehicles. I have conducted and assisted in numerous narcotics investigations leading to the arrest and conviction of numerous narcotics traffickers in North Carolina. Additionally, I have initiated, participated in, or directly supervised several thousand narcotics investigations involving interdiction, resulting in the seizure of tens of thousands of pounds of illegal narcotics and several millions of dollars in bulk United States currency.

3. Through my training and experience, I am familiar with the appearance, packaging, manufacturing, sale, and distribution of controlled substances. I am also familiar with the persons, practices, and customs involved in the possession, manufacture, sale, and delivery of controlled substances. As part of this, I am familiar with ways in which controlled substances are unlawfully transported in bulk amounts utilizing public roads and semi-tractor trailers and other motor vehicles.

4. This declaration is submitted in support of a Verified Complaint of Forfeiture for a 2018 Freightliner Cascadia semi-tractor truck, VIN 3AKJHHDR1JSJJ1903 (hereinafter referred to as the "2018 Freightliner"), seized on August 1, 2023, from the possession of Hao BAI and Cheng Kuan QIAN.

5. Based on the investigation described below, there is probable cause to believe that the 2018 Freightliner is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(4).

6. The facts and circumstances set forth in this declaration are based upon information provided by other law enforcement officers and my own personal knowledge and experience. Because this declaration is being submitted for the limited purpose of establishing probable cause, I am not including all the facts and information that I have learned about or obtained during the course of this investigation.

7. On August 1, 2023, at approximately 4:22 p.m., Deputy T.A. Weavil of the GCSO was sitting stationary in the median observing northbound traffic on Interstate 85 North in Guilford County, North Carolina. Deputy Weavil observed the 2018 Freightliner traveling under the speed limit. Deputy Weavil did not see a registration plate displayed on the tractor trailer.

8. Deputy Weavil has a total of 25 years of law enforcement experience, with 17 years employed by the GCSO. Deputy Weavil has been assigned to the Special Operations Division/Special Enforcement/Interdiction Team since February 2023. In 1997, Deputy Weavil received a Bachelor of Science Degree from Western Carolina University. In 1997, Deputy Weavil completed Basic Law Enforcement Training. Deputy Weavil was later awarded the Advanced Law Enforcement Certificate. Deputy Weavil has participated

3

in hundreds of hours of specialized law enforcement training presented by the North Carolina Justice Academy, Drug Enforcement Administration, and other sources relating to criminal investigation techniques and narcotic investigations. This includes approximately 144 hours of specialized training focused on criminal interdiction. Deputy Weavil has received training in highway interdiction, comprehensive roadside interdiction, hidden compartment interdiction, and commercial vehicle interdiction. Deputy Weavil has participated in the investigation of hundreds of narcotic cases, which have led to the arrest and conviction of numerous individuals for felony and misdemeanor drug violations in state and federal courts. Deputy Weavil is familiar with the identity of various types of controlled substances, how they are manufactured, stored and packaged, and how they are transported.

9. Deputy Weavil pulled into traffic to observe the 2018 Freightliner. Deputy Weavil noticed a piece of paper taped to the back of the trailer. The paper appeared to be a handmade registration tag. Deputy Weavil then initiated a traffic stop of the 2018 Freightliner. Deputy Weavil observed that on the side of the 2018 Freightliner appeared a sign displaying the name "Chirstar LLC," United States Department of Transportation registration number 4064858, Motor Carrier registration number 1543072, and California registration number 628116. The 2018 Freightliner was pulling a white 2018, 53' Stoughton dry van trailer ("trailer") displaying the aforementioned handwritten paper tag bearing registration number "4RM5635."

10. Deputy Weavil approached the cab of the 2018 Freightliner and made contact with the driver who identified himself as Cheng Kuan QIAN. Deputy Weavil inquired why

4

the trailer was displaying a paper tag instead of a state-issued registration plate. QIAN stated the California issued registration plate had been lost due to high wind in Georgia. QIAN provided pictures of registration cards for the trailer and the 2018 Freightliner. There being a language barrier between Deputy Weavil and QIAN, who speaks Chinese, Deputy Weavil used Google Translate to aid in communication. Deputy Weavil asked whether QIAN had reported the lost tag to police, and QIAN replied "no."

11. Deputy Weavil asked QIAN if he had the bill of lading[1] for the load. Deputy Weavil knew from experience that a bill of lading could help him determine whether the load was legitimate, whether the trailer could be verified, and whether a seal number[2] was identified on the bill of lading. QIAN provided two duplicate copies of a single bill of lading indicating the entire load weighed approximately 3,024 pounds. This weight seemed unusual to Deputy Weavil as it is commonly known that a 53' trailer can carry approximately 40,000 pounds of standard cargo, and that shipping companies traveling coast to coast generally attempt to maximize load capacity in order to maximize profitability. Deputy Weavil asked QIAN if the weight on the bill of lading was correct. QIAN indicated it was. Deputy Weavil asked QIAN how he was making any money with such a light load. QIAN stated that he was being paid by mileage, and he did not know how much he was being paid.

---

[1] A bill of lading is a document issued by a carrier to acknowledge receipt of cargo for shipment.

[2] A trailer seal, which bears an identifying number, is used to deter theft and maintain cargo security.

5

12. According to the bill of lading provided by QIAN, the 2018 Freightliner's journey and load had originated in California and was enroute to a delivery in Maryland. Deputy Weavil realized the most expedient/cost effective route traveling from California to Maryland would most likely not involve travelling on Interstate 85 North in North Carolina.

13. Deputy Weavil asked QIAN if there was anything on the truck not appearing on the bill of lading. QIAN stated he did not know and told Deputy Weavil he would need to ask the person in the sleeper berth. Deputy Weavil observed that the curtains to the sleeper berth were drawn closed, and asked QIAN if anyone was in the sleeper berth. QIAN replied that a co-driver was in the sleeper berth.

14. QIAN got the attention of his co-driver in the sleeper berth, who Deputy Weavil later identified as Hao BAI. BAI stuck his head through the sleeper berth curtains to speak with Deputy Weavil. BAI advise they were hauling two loads, and both BAI and QIAN began looking for the other bill of lading. BAI stated one load was going to Virginia and the other load was going to Maryland. BAI provided another bill of lading which indicated a weight of approximately 3,700 pounds. Deputy Weavil asked BAI about the gross weight, which was still less than 7,000 pounds, well under the 40,000 pound limit for the vehicle. BAI said the load consisted of large boxes which were light weight, and he did not know what was in the boxes. Deputy Weavil asked BAI if there was anything on the truck which was not on the bill of lading and BAI replied, "no."

15. Deputy Weavil returned to his patrol vehicle and checked records regarding the registrations for the 2018 Freightliner and the trailer, as well as QIAN's California

6

driver's license. As he was doing this, Deputy Weavil contacted me and requested assistance. As I was enroute to the scene, I queried various law enforcement databases using the registration numbers that had been provided. Deputy Weavil completed a handwritten warning ticket concerning the fictitious registration plate and expired trailer registration, which had expired on November 30, 2022.

16. I searched law enforcement databases and learned that trailer registration number 4RM5635 had been logged by a plate reader in Guadalupe, Texas, on July 28, 2023, at 3:49 a.m. This indicated to me that the 2018 Freightliner and its operators were taking an unusually long route from California to Virginia and Maryland, and a very inexpedient route, assuming the cargo was legitimate. In addition, travel from Guadalupe, Texas, to Guilford County, North Carolina, with two drivers, should normally take approximately 20 hours, not 3 or 4 days. Law enforcement databases also showed that trailer registration number 4RM5635 had been logged in the State of Georgia on July 23, 24, 25, and 26, 2023. This indicated to me that QIAN and BAI were not being completely honest regarding their actual travel itinerary.

17. Deputy Weavil re-approached the 2018 Freightliner to obtain the picture of the registration card for the trailer from QIAN, and BAI's California driver's license. While communicating with BAI inside the cab of the tractor, Deputy Weavil observed BAI kept the sleeper berth curtains closed tight against his body. It appeared that BAI was attempting to block a plain view inside the sleeper berth. Deputy Weavil is aware that drivers sometimes attempt to limit law enforcement's views of the sleeper areas of semi tractors when those areas contain contraband.

7

18. After I arrived on the scene to assist, Deputy Weavil and I approached the cab of the 2018 Freightliner and met with BAI and QIAN. We sought to clarify their initial statements regarding their travel itinerary, and the fact the loads initially appeared to not be cost effective based on the low weight relative to industry standards.

19. As I walked toward the cab, I observed the nuts holding on the hasp (part of the locking mechanism) of the right rear trailer door were not installed to industry standard and the nuts on hasp exhibited "socket ghosting." Socket ghosting occurs when a socket wrench has been utilized to turn the nuts with such frequency it discolors the metal and it indicates someone is opening the trailer doors without breaking any installed truck seals by disassembling the hasp latch. Socket ghosting commonly occurs in the transportation of controlled substances and other contraband by semi-tractor trailer.

20. Deputy Weavil requested consent from both BAI and QIAN to search the inside of the trailer. Both BAI and QIAN gave consent. Deputy Weavil and I walked to the rear of the trailer. I removed a plastic JJ Keller seal that was affixed to the trailer door retaining rings. Per industry standards, a seal should be attached to the hasp latch on the trailer door, not on retaining rings, which I found to be suspicious.

21. I opened the right side trailer door and initially observed cargo that appeared to be neatly loaded onto wood pallets and wrapped in plastic wrap per industry standards. However, Deputy Weavil then looked behind the left side door and observed a loose box, that was not stacked on a pallet, with all of its seams having been "H-taped." Neither loose boxes nor excessively taped boxes are consistent with industry standards.

22. I opened the left side door of the trailer and removed the loose box. I observed the box was non-descript with no markings indicating its contents. Deputy Weavil then observed two or three similar loose boxes. I removed two of the loose boxes from the trailer and asked BAI who owned the boxes. BAI stated, "the owner, who was in California." I asked BAI if he knew what was in the boxes. BAI stated, "I don't know." I asked BAI for consent to open one of the boxes. BAI gave consent. I opened the box in question and quickly determined the box contained numerous vacuum sealed bags of suspected marijuana. At this point BAI and QIAN were detained and ultimately arrested for trafficking marijuana.

23. I asked BAI if there was anything else we needed to be concerned about, and BAI stated, "they put more boxes in the truck, because there was not enough space." I also asked BAI if the loose boxes I had pulled from the trailer were on the bill of lading. BAI responded "no." BAI stated that he was told the boxes were electric cigarettes, that he was told to bring to a Love's Truck Stop parking lot in Virginia and someone would meet them. Such delivery arrangements are clearly inconsistent with industry standards and are consistent with transporting contraband.

24. Deputy Weavil and I searched the cab of the 2018 Freightliner. We discovered nine more non-descript boxes that ultimately were determined to contain vacuum-sealed bags containing suspected marijuana. A total of twenty five additional, similar boxes ultimately determined to contain vacuum-sealed bags containing suspected marijuana were discovered in the trailer, for a total of thirty four boxes of suspected marijuana. The total combined weight of the suspected marijuana is approximately seven

9

hundred and twelve (712) pounds. The remainder of the cargo on the trailer was determined to be comprised of two separate loads of legitimate freight.

25. Both BAI and QIAN were transported to the Greensboro Magistrate's Office and both were charged with Trafficking in Marijuana by Possession and Trafficking in Marijuana by Transport. BAI and QIAN were held in the custody of the Guilford County Jail under a secured bond of $75,000.00 each. The criminal charges remain pending at this time.

26. Both BAI and QIAN were interviewed at the Guilford County Sheriff's office.

27. During his interview, BAI stated to law enforcement that he had been working for Chirstar LLC since March 2022.

28. During his interview, QIAN stated to law enforcement that his wife had purchased the 2018 Freightliner in May of 2023, and that the trailer was rented. QIAN also stated that BAI had loaded the truck in Corona, California, and he (QIAN) did not know what was in it. QIAN stated that he and BAI had departed from Corona, California, the day before (July 31, 2023) and drove across country without stopping until they reached a stop in Georgia at approximately 8:30 a.m. the next day (August 1, 2023; the current day). QIAN further stated that they stopped at a specific storage site in Suwanee, Georgia, to unload some of their cargo. QIAN provided the name and address of the storage site. QIAN stated that they had departed their Georgia stop at approximately 10:30 a.m. that day, and were to travel to Maryland, then to Florida, and then return to California. At the end of the

interview, QUIAN was allowed to call an individual who he stated was his wife and was named "Lin Lin."

29. While at the jail, BAI stated to me that he was the owner of the 2018 Freightliner and it was paid off with no outstanding liens.

30. I seized the 2018 Freightliner and placed in the custody of the United States Marshals Service. The trailer was not seized and the owner was contacted.

31. Other items seized included two cell phones, pictures of the registration cards, four trailer seals, miscellaneous documents, two bills of lading that were produced during the stop, and certain personal effects.

32. A search of law enforcement databases did not yield any prior criminal history for either QIAN or BAI.

33. According to State of California records, Chirstar LLC was formed on May 22, 2022, and is located in Corona, California. Lin LIN is listed as the manager or member, and the registered agent for the company.

34. DEA adopted the seizure of the 2018 Freightliner and began administrative forfeiture proceedings. Notice of the forfeiture proceeding was published on an official government internet site (www.forfeiture.gov) from October 9, 2023, through November 7, 2023.

35. On October 26, 2023, DEA received an administrative claim to the 2018 Freightliner from an individual named Lin LIN. In the claim, LIN states that she is the owner of the 2018 Freightliner, and that BAI is her husband. With her claim, LIN submitted

a copy of a State of California Certificate of Title listing her as the owner of the 2018 Freightliner.

36. Upon receipt of the claim, the administrative forfeiture process on the 2018 Freightliner was terminated, and the seizure was referred to the United States Attorney's Office for judicial forfeiture.

## CONCLUSION

37. Based on the investigation, facts, and circumstances related above, there is probable cause to believe that the 2018, Freightliner Cascadia Tractor Truck, VIN 3AKJHHDR1JSJJ1903, was used or was intended for use, in any manner or part, to commit or to facilitate the transportation, sale, receipt, possession, or concealment of a controlled substance, in violation of the Controlled Substances Act, 21 U.S.C. §§ 801 et seq., and is therefore subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(4).

This the 24th day of January, 2024.

Kevin Cornell
Task Force Officer
Drug Enforcement Administration